OPINION
{¶ 1} Defendant, Charles Whiteside, appeals from his conviction and sentence for rape.
 {¶ 2} The evidence presented by the State demonstrates that, during the summer of 2001, Defendant and his young son lived at 2901 Millicent Avenue, Dayton, with Defendant's father, stepmother, and sixteen year old half-sister, S.W. One day in July after S.W. awoke, she went through her regular morning routine of eating breakfast and then taking a shower. S.W.'s father had left the house to take her mother to work. As S.W. was finishing her shower she heard Defendant go downstairs and leave the house. After S.W. went into her bedroom and closed the door, she heard Defendant come back inside the house and walk up the stairs.
 {¶ 3} Defendant opened S.W.'s bedroom door, whereupon she told him to get out. Instead of leaving, however, Defendant entered S.W.'s bedroom, pushed her down on the floor between the bed and the dresser, and laid on top of her. Defendant pulled S.W.'s panties down as she screamed at him to get off her and unsuccessfully struggled to free herself. Defendant then engaged in vaginal intercourse with S.W. Defendant was interrupted by the sound of their father's car entering the driveway, and he jumped up and ran into his bedroom. Defendant warned S.W. not to tell her parents. S.W. complied because she was afraid that her father would hurt Defendant.
 {¶ 4} After this incident S.W. avoided being alone with Defendant at the house. One day in August 2001, after her father had left the house to take S.W.'s mother to work, S.W. was finishing her shower when she heard Defendant go downstairs and leave the house. After putting on underclothes and a bathrobe, S.W. went downstairs to get her clothes out of the dryer. Defendant returned before S.W. could get back upstairs.
 {¶ 5} Defendant grabbed S.W. and pulled her down onto the floor in the living room. Defendant pulled S.W.'s panties down and laid on top of her. Once again S.W. told Defendant to get off of her, and again struggled unsuccessfully to free herself. Just as he did before, Defendant engaged in vaginal intercourse with S.W. Defendant was interrupted when their father sounded the horn of his car as he pulled into the driveway. Defendant jumped up and ran into the bathroom. S.W. ran upstairs. The next day Defendant warned S.W. not to tell her parents because they wouldn't believe her. S.W. never gave Defendant permission to engage in sexual activity with her.
 {¶ 6} Around August 31, 2001, Defendant asked his father to take him to a doctor for treatment for some "personal problems." Defendant did not have any health insurance, and so his father took him to the Montgomery County Combined Health District. Defendant reported to a nurse there that he was experiencing a discharge from his penis. Lab tests showed that Defendant had an inflammation of the urethra, a condition commonly called "NGU." Defendant was given a supply of antibiotics and was told that chlamydia was the most common cause of NGU, and that he needed to call back in two weeks for the results of his chlamydia test. When Defendant left the clinic his father asked him about the pills he had received. Defendant responded: "It's the same thing I had in Cleveland. Chlamydia."
 {¶ 7} On September 7, 2001, Defendant's lab tests came back positive for chlamydia. About this same time Defendant and his father got into an argument that erupted into a physical altercation because Defendant was not working. Defendant's father put Defendant on a bus to Cleveland where other members of Defendant's family lived. Two days later, Defendant's girlfriend drove to Cleveland and picked Defendant up and brought him back to her house in Dayton, where Defendant lived until police arrested him for these offenses.
 {¶ 8} On November 1, 2001, S.W. told her parents that Defendant had raped her. Police were called and S.W. went that same day to see her doctor. On November 8, 2001, the results of S.W.'s tests for sexually transmitted diseases came back positive for chlamydia. Defendant was arrested on November 21, 2001, at his girlfriend's house. When questioned by police Defendant denied raping S.W. and said he never had chlamydia.
 {¶ 9} Defendant was indicted on two counts of rape. R.C.2907.02(A)(2). Following a jury trial, Defendant was found not guilty of the July rape but guilty of the August rape. The trial court sentenced Defendant to three years imprisonment and labeled him a sexually oriented offender.
 {¶ 10} Defendant has timely appealed to this court from his conviction and sentence.
 FIRST ASSIGNMENT OF ERROR {¶ 11} "Whether defendant's conviction for rape was supported by the manifest weight of sufficient evidence or beyond reasonable doubt and the absence of which violated defendant's constitutional right to due process under the fifth and fourteenth amendment of the United States Constitution and Article I Section 10 of the Ohio State Constitution."
 {¶ 12} Defendant argues that the trial court erred in overruling his Crim.R. 29 and post verdict motions for acquittal because the evidence presented by the State was insufficient to sustain his conviction for rape.
 {¶ 13} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991), 61 Ohio St.3d 259:
 {¶ 14} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 15} Defendant was convicted of violating R.C. 2907.02(A)(2), which provides:
 {¶ 16} "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" includes vaginal intercourse. R.C.2907.01(A).
 {¶ 17} The testimony of S.W. alone, if believed, is sufficient to convince the average mind of Defendant's guilt, beyond a reasonable doubt. Moreover, the State presented evidence that corroborates S.W.'s testimony. For instance, S.W. testified that she never had sexual relations with other persons either before or after the rapes occurred. S.W.'s physician, Dr. Bockhorn, testified that the fact S.W. tolerated the speculum (examining instrument) well indicated some sort of prior vaginal penetration. That evidence corroborates S.W.'s testimony that Defendant had vaginally raped her.
 {¶ 18} The evidence presented by the State also demonstrates that on August 31, 2001, Defendant sought medical treatment for a discharge from his penis; that on September 7, 2001, Defendant tested positive for chlamydia; that on November 8, 2001, S.W. tested positive for chlamydia; that S.W. had never engaged in sexual activity prior to or after Defendant raped her; and, that a man with chlamydia spreads the disease by contact with his infected body fluids via ejaculation or urethral discharge. The jury could reasonably infer from this direct evidence that Defendant infected S.W. with chlamydia via sexual conduct, which further corroborates S.W.'s testimony.
 {¶ 19} Viewing this evidence in a light most favorable to the State, a rational trier of fact could find the essential elements of rape proven beyond a reasonable doubt. Defendant's conviction is supported by legally sufficient evidence.
 {¶ 20} Defendant additionally argues that his conviction is against the manifest weight of the evidence. In support Defendant claims that S.W.'s testimony is not worthy of belief because of inconsistencies in the details of the accounts she gave of the events; because no semen stains were found on the floor where the rapes occurred; because it is not possible to tell with absolute certainty if S.W. was infected with chlamydia by Defendant; and, S.W. never exhibited any fear or anxiety about being around Defendant after the rapes, as would be expected had he raped her.
 {¶ 21} A weight of the evidence argument challenges the believability of the evidence; which of the competing inferences suggested by the evidence is more believable or persuasive. Hufnagle,supra. The proper test to apply to that inquiry is the one set forth inState v. Martin (1983), 20 Ohio App.3d 172, 175:
 {¶ 22} "(T)he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."
 {¶ 23} Defendant testified at trial and denied raping S.W. Defendant suggested that S.W. was jealous and may have fabricated the story because she was not getting the attention she was used after Defendant and his two year old son moved into the house.
 {¶ 24} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. Statev. DeHass (1967), 10 Ohio St.2d 230. In State v. Lawson (August 22, 1997), Montgomery App. No. 16288, we stated:
 {¶ 25} "(b)ecause the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." Id., at p. 4.
 {¶ 26} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict.State v. Bradley (October 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 27} While minor and peripheral inconsistencies exist in some of the details of the accounts of the rapes that S.W. gave to police as against her trial testimony, the basic elements of her accounts remained the same. The State's evidence demonstrates that it is not at all unusual in rape cases to find no physical evidence such as semen stains. Furthermore, while it is not possible to say with absolute certainty that Defendant was the source of S.W.'s chlamydia infection, the jury could reasonably infer that Defendant infected S.W., given the direct evidence presented by the State. As for Defendant's claim that S.W.'s credibility was diminished by her lack of fear of him following the rapes, the evidence shows the substantial efforts S.W. made to avoid being in the house alone with Defendant after the July incident. Additionally, although S.W. spent the day at Kings Island with Defendant and his girlfriend following the August incident, she testified that once they got to the park she spent most of the day alone on the rides.
 {¶ 28} The jury in this case did not act unreasonably in choosing to believe S.W.'s version of the events rather than Defendant's. In reviewing this record as a whole we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice has occurred. Defendant's conviction is not against the manifest weight of the evidence.
 {¶ 29} The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR {¶ 30} "Whether the court erred in failing to hold a hearing three days prior to trial pursuant to ORC 2900.00 (sic) concerning the prior sexual behavior of the alleged rape victim since said sexual history was a necessary element of the evidence used by the state to convict doubt (sic) and the absence of which violated defendant's constitutional right to due process under the Fifth, Sixth, and Fourteenth amendment of the United States Constitution and Article 1 Section 10 of the Ohio State Constitution."
 {¶ 31} The prosecutor asked S.W. during her direct testimony whether she had ever engaged in sexual relations with another person before these alleged rapes took place. (T. 147). Defendant objected that the evidence the question sought to elicit is inadmissible per the rape shield statute. R.C. 2907.02(D) and (E). The trial court then recessed the proceedings and conducted a hearing in chambers.
 {¶ 32} R.C. 2907.02(D) prohibits reputation and opinion evidence concerning the victim's sexual activity and evidence of "specific instances" of a victim's sexual activity unless two conditions are satisfied. First, it must be evidence that "involves . . . the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender." Id. Second, the court must find that "the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." R.C. 2907.02(E) further requires a hearing in chambers to determine those matters "not less than three days before trial, or for good cause shown during the trial."
 {¶ 33} Defendant argued at an in-chambers hearing the court held during trial that the evidence the prosecutor's question sought to elicit was inadmissible under R.C. 2907.02(D), and that even if it was admissible the prior hearing that R.C. 2907.02(E) requires to determine its admissibility had not been held. The State responded that the rape shield statute was not implicated by the question because it concerned the absence of sexual activity, not its occurrence. The court agreed with that proposition and overruled Defendant's objection. The court further stated that it would "permit cross-examination on those issues" by the Defendant. (T. 152).
 {¶ 34} R.C. 2907.01(C) defines sexual activity to include both "sexual conduct" and "sexual contact," as those terms are defined by R.C. 2907.02(A) and (B), respectively. All of the matters those definitions involve are positive acts, not an omission to act. It was on that basis that the court concluded that a question concerning the absence of any sexual activity on the victim's part does not trigger the protections of the rape shield statute.
 {¶ 35} The State also contended that the question was proper because the evidence it sought to elicit tended to show that the victim's chlamydia was a product of her rapes by the Defendant, who suffered from the same communicable disease, and to that extent "involves evidence of the origin of . . . disease." We agree that it did. However, we do not agree with the State's other contention that the evidence sought was not within the protections of the rape shield statute because it concerned the absence of sexual activity, a view with which the trial court agreed.
 {¶ 36} The absence of sexual activity is not proof of sexual activity, much less any specific instance of it. Nevertheless, an assertion that no sexual activity took place does concern sexual activity, and to that extent is evidence within the ambit of R.C.2907.02(D). A contrary holding would not serve the broad and prophylactic purpose of the act, which is to avoid badgering and embarrassment of both victims and defendants. And, while we have some doubts whether the protections the statute affords a victim can be invoked in this way, by a defendant, R.C. 2907.02(D) states that such evidence "shall not be admitted" unless the conditions of the statute are first satisfied. That flat prohibition runs both ways.
 {¶ 37} Here, the conditions that R.C. 2907.02(D) imposes were satisfied. Though the evidence the prosecutor's question sought to elicit was a matter concerning specific instances of the victim's sexual activity, in that there were none, the evidence involved the origin of disease and was therefore admissible. The further question is whether the failure to hold the hearing that R.C. 2907.02(E) requires to determine admissibility of that evidence at least three days before it was offered so prejudiced Defendant that it constitutes reversible error.
 {¶ 38} R.C. 2907.02(E) permits the in-chambers hearing during trial instead of three days prior "for good cause shown." The State asserts that the view it took, that the evidence it sought did not involve a specific instance of the victim's sexual activity, which caused it to not ask for a prior hearing, constitutes such good cause. We are willing to accept that representation in this instance. However, this opinion puts the State on notice that in future cases it should request a hearing at least three days before such evidence is offered to determine the admissibility of sexual activity evidence of this kind.
 {¶ 39} Neither can we find that the Defendant was unduly prejudiced by the failure to hold the prior hearing that R.C. 2907.02(E) contemplates. The fact that S.W. had no sexual relations with any other person was neither inflammatory nor prejudicial. The court conducted a hearing in chambers during the trial in which Defendant contended the evidence was inadmissible. When the court held the evidence admissible, the court afforded the Defendant a full right of cross-examination on the matter involved; the victim's lack of other sexual relations. The record reveals that the Defendant never exercised that right. Therefore, no undue prejudice is shown.
 {¶ 40} The second assignment of error is overruled.
 THIRD ASSIGNMENT OF ERROR {¶ 41} "Whether the trial court erred in failing to give the requested instruction to the jury concerning the impropriety of making an inference upon an inference doubt and the absence of which violated defendant's constitutional right to due process under the Fifth andFourteenth Amendment of the United States Constitution and Article I Section 10 of the Ohio State Constitution."
 {¶ 42} At the conclusion of the trial court's instructions to the jury, Defendant requested that the court instruct the jurors that "you may not make an inference on an inference." The trial court refused to give the requested instruction. Defendant now argues that the trial court abused its discretion in refusing to give his requested instruction. Defendant claims that in order to use the evidence regarding chlamydia to find him guilty of rape, the jurors had to stack inference upon inference. We disagree.
 {¶ 43} A trial court's refusal to give a requested jury instruction is prejudicial error if the instruction correctly states the law, is pertinent to the case, and its substance is not otherwise covered by the general charge. State v. Snead (1992), 63 Ohio St.3d 3.
 {¶ 44} First, we note that the court's general charge to the jury did include an instruction on circumstantial evidence and inferences. That instruction informed jurors that they were permitted, but not required, to draw an inference "from other facts which you find have been established by direct evidence." The trial court's instruction on inferences did not permit the jury to make an inference based solely upon another inference. State v. Palmer, 80 Ohio St.3d 543, 1997-Ohio-312.
 {¶ 45} Second, Defendant's requested instruction was not a complete or accurate statement of law. In State v. King (May 17, 1995), Montgomery App. No. 14309, this court observed:
 {¶ 46} "Though widely denounced by both courts and legal commentators, the rule prohibiting the stacking of one inference upon another is still recognized in Ohio. Motorists Mut. Inc. So. v. HamiltonTwp Trustees (1986), 28 Ohio St.3d 13, 28 OBR 77, 502 N.E.2d 204. Nevertheless, the rule has very limited application. It prohibits onlythe drawing of one inference solely and entirely from another inference,where that inference is unsupported by any additional facts or inferencesdrawn from other facts. Hurt v. Charles J. Rogers Transp. Co. (1955),164 Ohio St. 329, 58 O.O. 122, 130 N.E.2d 820, paragraph one of the syllabus. But the rule does not forbid the use of parallel inferences in combination with additional facts. Id. at paragraph two of the syllabus. Nor does it prohibit the drawing of multiple inferences separately from the same set of facts. Id."
 {¶ 47} Lastly, Defendant's requested instruction was not pertinent because the evidence regarding chlamydia which is the focus of his argument, did not require the jury to impermissibly stack one inference upon another inference in order to find Defendant guilty of rape.
 {¶ 48} S.W. testified that Defendant vaginally raped her in July and August 2001, and that she had never engaged in sexual relations with anyone before or after those rapes occurred. The examining physician, Dr. Bockhorn, testified that the fact S.W. tolerated the speculum well during her examination indicated she had experienced a sort of vaginal penetration of some kind in the past. S.W. tested positive for chlamydia after the rapes occurred. Shortly after the rape in August, Defendant sought medical treatment for penile discharge. Defendant told his father he had chlamydia. Defendant's lab tests came back positive for chlamydia. A male infected with chlamydia spreads that disease by contact with his infected body fluids via penetration and either ejaculation or urethral discharge.
 {¶ 49} Each of these propositions was proved by direct evidence. From them, the jury reasonably could infer that Defendant had engaged in sexual intercourse with S.W. That inference is not drawn solely from any other inference. Therefore, the conclusion of guilt to which that inference leads involves no impermissible "stacking."
 {¶ 50} The third assignment of error is overruled. The judgment of the trial court will be affirmed.
FAIN, P.J. and WOLFF, J., concur.